# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

| | | |
|---|---|---|
| United States of America<br>v.<br>ZAMORA, MEISY ANGELICA (MEX), YOB: 1960<br><br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.   SEALED<br><br>M-18-mj 1507<br><br><br>**SEALED** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __in or about 2000 to 2018__ in the county of __Hidalgo__ in the __Soutnern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1349 | Conspiracy to Commit Health Care Fraud. |

This criminal complaint is based on these facts:

See Attachment.

☑ Continued on the attached sheet.

Approved ARS
7/24/18

*Complainant's signature*

Joshua T. Bley, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/24/18 @4:38 p.m.

*Judge's signature*

City and state:     McAllen, Texas              Juan F. Alanis, U.S. Magistrate Judge
*Printed name and title*

## Attachment

1. Title 18, United States Code, Section 1347, provides in relevant part:

    Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both[.]

2. Title 18, United States Code, Section 1349, provides:

    Any person who attempts or conspires to commit any offense under this chapter [i.e. health care fraud, 18 U.S.C. § 1347] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

3. A "health care benefit program" under Section 24(b) of Title 18, United States Code, was defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

4. The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were over the age of 65 or disabled. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"), administered Medicare.

5. Jorge Zamora-Quezada ("Dr. Zamora") was a physician licensed to practice medicine in the State of Texas. From in or about 2000 through in or about 2018, Dr. Zamora operated medical practices within the Southern District of Texas which purported to specialize in rheumatology and other degenerative diseases. The medical practices were established and operated under the entities Jorge C. Zamora-Quezada, MD, MPH, PA, and the Center for Arthritis & Osteoporosis I, PA (collectively the "Medical Practices").

6. On May 9, 2018, a Federal Grand Jury sitting in McAllen, Texas, returned a 7-count indictment against Dr. Zamora, alleging health care fraud conspiracy, health care fraud, and money laundering conspiracy. *United States v. Jorge Zamora*-Quezada, 7:18-CR-855. The Indictment alleged, inter alia, a long-running conspiracy to commit health care fraud. The manner and means of the alleged health care fraud conspiracy included, among other things, the submission of false and fraudulent claims to health care benefit programs, including Medicare, based on patients who were falsely diagnosed with rheumatoid arthritis and other degenerative diseases.

7. **MEISY ANGELICA ZAMORA ("MEISY ZAMORA")** was the spouse of Dr. Zamora.

8. Testifying at a bankruptcy proceeding in McAllen, Texas on January 30, 2017, **MEISY ZAMORA** stated that she first met Dr. Zamora in 1999, around the time he "started all the paperwork" to open the Medical Practices. **MEISY ZAMORA** and Dr. Zamora were married in January 2000. From that time on, **MEISY ZAMORA** testified that she has "always been involved in Dr. Zamora's business in the clinic and other enterprises." **MEISY ZAMORA** further testified that she "substantially participates in the running" of the Medical Practices, although she is not licensed to practice medicine in the United States (she claimed to be licensed in Mexico). **MEISY ZAMORA** testified that she receives a salary from the Medical Practices, and spends 60 to 70 percent of her time working for the Medical Practices. **MEISY ZAMORA** further testified that she attended "corporate meetings where corporate decisions were made" about the Medical Practices, and is primarily responsible for overseeing the entities that own the properties where the Medical Practices are located, as well as the entities that purchase and own the medical equipment used by the Medical Practices.

9. During the course of the investigation, Investigators interviewed Employee 1, who was the practice manager of the Medical Practices from 2011 to 2015. Employee 1 stated that **MEISY ZAMORA**, who insisted that employees refer to her as "Doctora Meisy," had an office in each location of the Medical Practices and was actively involved in supervising employees. Employee 1 stated that the Medical Practices were driven by revenue targets, not patient care. Specifically, Dr. Zamora would establish quotas for different procedures: infusions, injections, x-rays, MRI, lab testing, and ultrasounds, and would get angry if the staff did not meet these quotas because the Medical Practices needed the revenue "to meet payroll." Employee 1 stated that the quotas were discussed in terms of increasing revenue, without any discussion about patient needs. **MEISY ZAMORA** participated in supervisor meetings regarding the quotas, and was copied on emails with spreadsheets tracking the quotas. Employee 1 further stated that employees frequently raised patient complaints with **MEISY ZAMORA** because employees were frightened to discuss complaints with Dr. Zamora.

10. Investigators interviewed Employee 2, who was the billing supervisor at the Medical Practices from 2010 to 2015. Employee 2 stated that **MEISY ZAMORA** participated in weekly and bi-weekly supervisor meetings, at which discussion typically centered around increasing "productivity" and "quotas" in a way that was completely divorced (and even contrary) to patient care. The focus was on increasing revenue through ordering more tests and procedures, regardless of what patients actually needed. Employee 2 stated that **MEISY ZAMORA** was "all about the money." She frequently questioned the billers about how much money was coming in to the Medical Practices from programs like Medicare. **MEISY ZAMORA** also frequently pushed the staff to get more patients into the clinic, and to hound existing patients to come in for follow up visits, instructing staff to tell the patients that the "doctor says you need to come in." Employee 2 also saw instances where patients attempted to complain to **MEISY ZAMORA**. For example, patients would complain that they had waited for hours to see Dr. Zamora, but had received only a cursory examination, lasting only a few minutes. Patients would attempt to voice their concerns to "Doctor Meisy," questioning how Dr. Zamora could have diagnosed them properly in only a few minutes, but **MEISY ZAMORA** would refuse to speak to them. Employee 2 felt pressured by Dr. Zamora and **MEISY ZAMORA** to falsify claims in order to ensure payment from Medicare and other programs. Eventually, Employee 2 stated that Dr. Zamora and **MEISY ZAMORA** replaced her with another billing supervisor who she felt would be willing to submit false and fraudulent claims.

11. Investigators interviewed Employee 3, who was a medical assistant at the Medical Practices from 2011 to 2017. According to Employee 3, it was common for billers to instruct medical assistants to change diagnosis codes on patient encounter notes. According to Employee 3, if a patient received a test or procedure that was not reimbursable based on the patient's diagnosis, billers and medical assistants were trained to change the patient's diagnosis to result in a payment, even if the diagnosis was false. For example, Employee 3 stated that claims for B-12 injections were often denied unless the patient was diagnosed with anemia. If a non-anemic patient had been given a B-12 injection, billers and medical assistants were instructed to insert a false diagnosis of anemia in the patient's chart, based on which billers would submit a claim for the injection under the false diagnosis, resulting in a payment.

12. Investigators also interviewed Employee 4, who worked in the billing department of the Medical Practices from 2013 to 2015. Employee 4 stated that she was taught that certain billing codes would not pay well. When these codes were submitted, billers were instructed to return the sheets to medical assistants so that "better codes" could be inserted. Employee 4 was informed by the billing supervisor, Estella Natera, that Dr. Zamora would get very angry if Medicare billing was low.

13. Investigators interviewed Employee 5, who worked for the Medical Practices from 2014 to 2016 in the billing department. Employee 5 stated that **MEISY ZAMORA** would make daily "rounds" at the Medical Practices. **MEISY ZAMORA** was aggressive with the staff about

3

patient volume, frequently asking "Why isn't my clinic full?" While working in the billing department, Employee 5 stated that it was common for the billing supervisor to instruct nurses and medical assistants to change diagnosis codes in order to ensure that claims submitted to Medicare, and other programs, would not be denied.

14. In addition, investigators interviewed employees who stated that **MEISY ZAMORA** helped further the health care fraud conspiracy by participating in the alteration and manufacture of medical records in response to investigations by law enforcement agencies.

15. Employee 3, discussed above, stated that employees of the Medical Practices were instructed to create false and fictitious medical records in response to Grand Jury subpoenas served on the Medical Practices in January and March of 2017. Employee 3 stated that **MEISY ZAMORA** was involved in the process of creating false and fictitious records. Specifically, **MEISY ZAMORA** worked with the laboratory technician to create missing laboratory results. Employee 3 believed that the results were being falsified.

16. Employee 6, a medical assistant at the Medical Practices for many years, confirmed the account of Employee 3, regarding the creation of false and fictitious medical records in response to the Grand Jury subpoenas in early 2017. Employee 6 stated that employees were concerned and uncomfortable with falsifying medical records. On several occasions, Employee 6 stated that he raised his concerns with **MEISY ZAMORA** and Dr. Zamora, but his concerns were brushed aside.

17. Employee 1, discussed above, informed investigators that **MEISY ZAMORA** was involved in collecting records in response to audits and investigations. On one occasion, Employee 1 was asked to come in to work on a weekend to collect records at a dilapidated barn used by the Medical Practices to store medical records. Employee 1 was uneasy with the request because he suspected that records were being altered or fabricated to respond to the investigation. Employee 1 made an excuse not to help, but later learned that **MEISY ZAMORA**, among others, spent the weekend compiling the records.

18. From 2000 through 2018, the Medical Practices submitted hundreds of millions of dollars in claims to Medicare, Medicaid, and other health care benefit programs, that were based, in part, on false and fraudulent statements.

19. Based on the above information, there is probable cause to believe that Title 18, United States Code, Section 1349, which makes it a crime to engage in a conspiracy to commit health care fraud, was violated by **MEISY ANGELICA ZAMORA**.

4